Good morning. Welcome to the 11th Circuit Court of Appeals. We're so happy to have you here with us today, and we are especially privileged to be sitting in the Judge Gerald Schoflat courtroom with the Honorable Judge Gerald Schoflat. So today we have one case on, just a reminder. I'm sure you're familiar with our lighting system, but just a quick review. When the yellow light goes on, you have two minutes left. When the red light goes on, your time is up. We ask that you please respect that timing limitation and end promptly when the red light goes on. The only exception to that is if we have a question for you, in which case we do want to hear the answer to our question. And so please do go ahead and answer that question, even if it's after the red light. And with that, we'll get started. We'll hear first from, is it Mr. Ryder? It is. Thank you, Your Honor. Good morning. May it please the Court. Jack Ryder on behalf of the Appellant Boat Owners. Your Honors, this case presents a classic example, a quintessential example of a waiver and estoppel. When we look at the dockage agreement and we look at the circumstances that transpired in this case, certainly there was this provision in the dockage agreement that the district media publicity or tropical storm or hurricane within 100 miles of the marina, as long as it does not imperil life for Lynn, there was this obligation to move the vessels out of the marina. But just hours later, the next day, September 12th, 2020, the marina emailed all boat owners and explicitly stated, quote, at this time, we are not calling for an evacuation of the marina. You should decide the best course of action for your boat. Certainly you acknowledge in the moorage agreement there are two ways to trigger the contractual duty for the boaters to evacuate their boats from the marina. You know, number one is that upon receiving notice from the landlord that it has activated its tropical storm and hurricane evacuation plan or upon news media publicity that a tropical storm or hurricane watch is issued within 100 miles of the marina. How is it that the email was not simply addressing the first, like, we're not telling you what we as the landlords have the right to do? We're not telling you that. But you tend to your own boats. Why is that not still preserving the second way? Sure. And I'll answer that in at least two ways. First of all, I acknowledge that there is the disjunctive component of the agreement. And I would respectfully submit that that reinforces the argument for waiver and estoppel. And the reason for that is, is that had the had there been silence, had there been silence by the marina, then I would have certainly said that that agreement would have been triggered. But it was the verbal act, the actual statement of we are not calling for an evacuation. And yes, Your Honor, prevented the trigger from occurring. Is that your argument?  It was nullified. They nullified it. Exactly. Triggered it already occurred. Correct. It was. I think nullification is the perfect word for this, Your Honor, because essentially it was saying, OK, the trigger has been activated, but we're telling you not to. But there's also more. It's not just the one email. What's significant, Your Honors, is that there were multiple emails. There were three more. September 14th, September 15th. Not one of them called for evacuation. But more importantly, each one of the emails that followed were called for additional action by the vessel owners, such as tying down everything to prevent it from being, you know, washed away. Like, for example, on the September 11th, 2020, which was immediately before the trigger, begin preparing for the storm with extra lines and fenders and removing all loose items from your boat. Then the day of the trigger email, September 12th, 2020, specifically said you should continue storm preparations, including securing your vessel with extra lines and fenders. And then it said then at this time, we are not calling for an evacuation of the boat. September 14th, 2020, at 1014, after the trigger and after the nullifying email, it said you should complete all preparations in the marina by this afternoon, as locally heavy rainfall is expected to flood. On September 15th, 2020, again, we have another email that says we'll continue to monitor conditions. The point is... There's nothing that says we've made our contract with you inapplicable. Is there? Well, no, Your Honor, but you don't, respectfully, you don't look to magic words or words of art to activate or nullify or establish a waiver and estoppel. In fact, the Florida Supreme Court has explicitly stated that waiver can occur by actions that demonstrate an intent to waive. And this, I would respectfully suggest, is a clear example of that. And that's why I think it's significant to look not just at the email, as Judge Toflat, you called it the nullifying email, but to look at the series of correspondence where each one repeatedly told these boat owners, not only are we not evacuating you, we're telling you to tie things down. We're telling you to make things secure. That's the opposite of the concept of an evacuation. And, you know, when a waiving party clearly informs the obligor that they need not perform a contractual duty, the obligor has the right to then assert waiver. And in Thomas v. Keller, waiver may be implied from conduct without a subjective intent to waive. So that goes back to what I, you know, Judge Rosenbaum, it's not about, they didn't have to say, we are hereby waiving your obligation. To the contrary, it's their actions that spoke volumes. Because their actions, the repeated emails, made it clear that not only are we not telling you boat owners to go, we're telling you to secure things in place. And if we continue, that also is not just a waiver, but it's an estoppel. You know, an estoppel is created when one party lulls another into a disadvantageous legal position or precludes a party from acting and then turns around and tries to use it almost as a gotcha. And here, we had, you know, and I would respect, with respect to the district judge, you know, the district judge found that there was no estoppel because he concluded that there was nobody who started to set sail and then turned back around. But estoppel isn't just action, it's also forbearance. It's also forbearing to act in reliance on a representation. And we had multiple, multiple pieces of evidence that were presented in opposition to the summary. The argument seemed to me to be that the MAC prevented them from doing their obligation. That's correct, Your Honor. Of the 100 miles thing. That is correct. However, there were a number of boats that were removed, weren't there? I mean, there were a lot of owners that did follow the lease and removed their boats. There were owners who left and there were over 29. We represent now 29. There were more than 29 who didn't leave. And I would add that the... And how many did leave? I don't know the number of that, Your Honor. I don't, I do not know how many left versus how many stayed. Doesn't that suggest that they were not lulled as you are suggesting that the, that your clients were lulled by these, I mean, they received the same emails. Your Honor, we, I would suggest that that would be a bit of speculation because we don't know what was in the mindset of those various boat owners or what their circum... We have an idea of where they were. We... I, I, Your Honor, I do not know from the different... Whether they're up in New York or where. I do not know, Your Honor. I do not know the answer to that question. In other words, there were boat owners who left. There were boat owners who didn't leave and there are boat owners who could not leave because they were outside of Florida. And there were several boat owners and this comes back to the issue of the estoppel because we did... But wasn't one of the reasons for the triggering effect was that some of these people wouldn't be around, but they could access the weather bureau. That I believe is an accurate reason why the trigger was in place, Your Honor. I think that's a reason why the trigger was in place, but, and quite frankly, had the marina, not through its course of conduct and the repeated emails, invalidated or nullified the wave, the trigger, then it would have been a different set of circumstances. But from a summary judgment perspective, which is what we're challenging, I would submit that certainly that's not a summary judgment position. And even if, even if the court did not conclude that this was a clear example of a waiver in estoppel, which would support summary judgment for the boat owners, there was... We have other arguments as well. For example... For the jury to decide the waiver issue? I think, you know, Your Honor, I think that the waiver issue can be established as a matter of law because it goes to the heart of the correspondence. But what could be a jury issue here... Oh, you'd have to draw a bunch of inferences. Well let's put it this way, Your Honor. I would agree that at a minimum it's a question of fact. But I think that...  What else is left for the jury?  The only thing now for the jury is damages. In other words, at this moment, based on the district court's ruling, the only thing left is damages. But with respect to the issue of another question of fact is whether or not these boat owners could have left. Because one of the things that we've noted, you know, not only do we argue that this entire provision is void for public policy reasons, and that's in our brief, but the other issue I would highlight is the fact that one of the provisions is if they can leave without danger to life and limb. What about the... Any boat owners who want to try that issue? Absolutely. I mean, of course, we... Yes, Your Honor. We put in... Yes, Your Honor. You think there's a tribal issue on some of those boat owners? As to whether... Yes. As to whether they're responsible for the damages, for example. Sure. Absolutely. And as to whether... How many were afraid to leave? We have identified at least three declarants, Your Honor, which we've identified. Stephen Elliott, who said he couldn't leave because of the circumstances of the storm. We cited to another declaration, I think of a Mr. Boatman, actually, I think is his name. So there was evidence in the record to support a question of fact as to whether or not these boat owners could have left safely, and that would nullify the provision also. What about the fact that the marina does not necessarily require the boat owners under these circumstances to leave? They have what's called... I don't know what the technical term. They provide a haul-out service. You can contract with somebody who will pull your boat out of the marina and store it safely? Yes, Your Honor. So how does that factor into the safety issue? I don't think that has any... Respectfully, I think that has no bearing on this issue in terms of the question at hand. In other words, there may have been some boat owners who did have those agreements and other boat owners who didn't, but I don't believe that that... I mean, that wasn't a requirement, for example. There had to be a plan in place, but that plan did not necessarily include contracting with an outside service. And you know... It was certainly offered to all boat owners. It was offered. Absolutely. It was offered, but I come back to the point, as Judge Tolflat, you characterize it as the nullifying email and the correspondence that followed. I know I'm into my rebuttal time, but I don't want to leave anything left. Okay. You're on our time now. Oh, I appreciate that, Your Honor. Thank you. You're on our time for answering our questions, is what I should say. Let me ask you one more question, though.  Yes, Your Honor. Of course. And that is about paragraph nine. The tenant acknowledges and agrees that if the vessel remains in the slip during any named storm, then it is natural, expected, and assumed that notwithstanding all efforts to secure the vessel, its presence in the marina will cause serious and substantial damage to the marina property. The tenant shall be liable for any and all damages to the landlord's property, blah, blah, blah, blah, blah, and then it shall be deemed to have caused liquidated damages to the landlord and the landlord's property in the amount of $25,000. I know that this is now out of play, but why is that so? Why wasn't that ruling incorrect? Well, Your Honor, to be clear, the liquidated damages provision was been thrown out by our side and the appellee did not cross-appeal that decision. So I would submit that that issue is not before the court, respectfully, because it has not been appealed. In other words, the decision to throw out the liquidated damages provision has not been appealed. All right. Let me just ask you from the standpoint of, well, I'll save it for when you're up on rebuttal. It's fine. All right. Before I end my, I know I'm in my rebuttal, but if I may use a little bit of it just to say this, because I don't want to not have the opportunity to address it on the back end on the rebuttal, and that is, I think it's also significant that the, and this is all, of course, in our brief, that the appellee, the marina, could not prove causation under the substantial factor test. And as Your Honor noted just now, we were only, we, the boat owners, could only be responsible for damage caused by our, the vessel at hand. So a boat owner could not be held accountable for damage caused by other boats. And instead of holding the marina to its burden of proven causation, the district judge, a substantial factor causation test, but couldn't prove substantial factor causation, I mean, the appellee could not prove it, because they could not demonstrate that any one of the vessels would have been able to have caused all of the damage. But looking at the mortgage agreement going on to, you're in subparagraph nine, I think, moving into subparagraph 10, it is impossible and impractical, impracticable to attempt to measure damages, allocate responsibility, or establish cause and effect relationships or consequences because of this impossibility, and that gets into the liquidated damages provision. But you have contractually agreed that the landlord cannot break apart exactly what damage relates to your boat. They're saying we can't measure damages or allocate them in that way. But Your Honor, I understand the point the court is making, but the liquidated damages provision was thrown out because it allowed for both liquidated damages and actual damages. The burden on the marina is to find a mechanism to establish damages, and their experts fail to do that. So the question of impossibility, the bottom line is, maybe it would have been a different paradigm, maybe it would have been a way to do it, but the way the court did do it was a joint and several liability paradigm, which doesn't exist. So with that, and I know I'm deeply into my rebuttal, do you have a question, Your Honor? I'm sorry. Okay, thank you. I'll reserve the rest of my time for rebuttal unless there are questions at this time. All right. Thank you. We'll actually give you your full rebuttal time of five minutes, and if we need to go an extra four minutes with Mr. Fleming, then we'll do that. Thank you, Your Honor. Can I assume I have 19 minutes? Yes. Okay. Thank you. May it please the court? Which I might just say, of course, you have the time. You can use it if you wish to do so. There's no obligation to use the 19 minutes. Thank you, Your Honor. Showing waiver requires that the party asserting the defense, quote, make out a clear case of waiver, close quote, and show, quote, clear relinquishment, close quote, of a right or obligation. That was the Costello versus. Let's talk a little bit about estoppel. All right. Because when I look at these emails, it does seem like there is a suggestion by the marina that there's no need to remove the boat at that time. I mean, that's what it says. It says, at this time, we are not calling for an evacuation of the marina. So why would anybody remove their boat in light or in the face of that language? Your Honor, because they agreed unambiguously in this contract that if the boats were left on the dock, that it would cause substantial damages to the dock. Why would you tell them you're not calling? I mean, you could have written a substantially similar email to them without saying that last line, at this time, we are not calling for an evacuation of the marina. And Your Honor, all that does at the most, at the most, as Judge Weatherill found, is that it waives one of the two triggers for an evacuation. Why doesn't it create an issue of fact, at the very least, for a jury to determine whether you have, whether you are stopped from proceeding with any kind of damages action against the plaintiffs here? Your Honor, the elements of estoppel, of course, are very, very strict. And this is not a jury trial, as Judge Ellen. I'm sorry. Not a jury. But a trial on the issue. Right. And the same judge that looked at this evidence and made these rulings would be the same judge that would make the rulings again on estoppel and waiver. But you wouldn't necessarily have all of the same evidence during a trial. Not necessarily, Your Honor. There . . . So, there could be, I mean, after hearing the additional evidence, the judge could make a different determination of fact. That's possible, but Judge Weatherill wrote, I think, very eloquently, is he narrowed down any email that could possibly be deemed to have been a relinquishment of the duty. Well, really, a waiver would have endangered the boat owners. For the marina owner, in effect, to say, to waive the 100-mile figure, which is what the argument is . . . Well, and . . . For the boat owners to have . . . the benefit of the waiver of that puts them in danger. Well, Your Honor, the . . . I'm not arguing with you. No, I understand. What I mean is the observation that if they nullified the 100-mile trigger and on top of it said we're not going to do the automatic, the second prong, they're endangering all the boats, the marina would be. And they never nullified that. I mean, they never nullified the 100-mile trigger. I understand. They never nullified that. If they did, that's what the consequences would be. Well, of course, it would have endangered the boats and the marina, and the parties all agreed to that. The parties agreed at the very beginning, the boat owners agreed. Every boat owner that's before this court agreed that if their boat was left in the marina during a storm, it would damage the docks and their boats. In fact, what they said there was . . . And that's in paragraph nine, right? That's in paragraph 26A9, correct, Your Honor? That kind of begs the question, why didn't you cross appeal on that issue? On what issue? On having thrown out . . . on having the liquidated damages provision thrown out. Your Honor, I . . . I mean, it doesn't obviously affect our judgment here, but I'm curious. It doesn't. And damages, of course, are still before the court. The damages issue, when we found that the Corbin test addressed the dilemma that the boat owners and the marina owner, Marina Lassie, the city that owns the marina, all agreed that it would be difficult or impossible to ferret out the damages, boat owner by boat owner. Corbin, in his test, adopted by the Florida courts in 1980 and then by two subsequent district courts since then, that is the law in Florida, that Corbin recognized that there could be situations like this. The First District Court of Appeals in the Cedar Hills case recognized there could be situations like this, and it said when they are, you don't have to prove that boat owner A cost $15,000, boat owner B cost $46,000. It's impossible to do so, so therefore, if their actions were a substantial factor in the total damages, then they're responsible for the total damages. That's what the Florida law so said, and that's what the court applied. Corbin says. Well, and that rule was adopted . . . It's the Corbin rule. Corbin rule, and it was adopted by the first DCA . . . I have a question. Certainly. When, under the Florida statute, would the marina have been barred from telling them to get out? When a hurricane warning or . . . Yeah, I understand, but I'm talking about when in the sequence of these e-mails and all that . . . Oh, I see. Would the marina have been barred from saying a word about getting out? Your Honor, that would have been September . . . I mean, 9-14.  When does that date have to do with the e-mail? I haven't laid the e-mails alongside that date, if you'll allow me. Your Honor, some of those e-mails were after that 9-14 date. If they're after the date, they're a nullity. They're a nullity.  Correct. They're meaningless. Because we couldn't have any way, but what did we waive? Wait a second. I'm sorry. Let me just get some clarification on this timeline that you're establishing. When you sent the e-mail on September 12th, the trigger, the 100-mile trigger, had been activated already. Correct. Correct. The contractual agreement for the boaters had been triggered. Correct. You then, on September 12th, sent an e-mail saying, at this time we are not calling for an evacuation of the marina. That's why we're debating . . . Correct. The statutory prohibition does not kick in, by my calculation, until September 14th, the afternoon. That is correct. Your e-mail comes before the statute kicks in. It does. While I'm still struggling with the waiver issue, because the contractual obligation, the 100-mile trigger, had already come into effect, you send an e-mail to the boaters that doesn't say, hey, there are two ways under the contract you have to evacuate. We're telling you we're not invoking our right. Because you didn't specify like that, you have a broader statement that says, at this time we're not calling for the evacuation of the marina. How is that not confusing at best to the boaters who know that their secondary obligation has already been triggered? Well, Your Honor, I don't think it's confusing because they knew if they left their boat in the marina that it would destroy the docks. Right, but there are two ways, two contractual triggers. You have one, the marina can call for it, and number two, there's a 100-mile warning trigger. That has already gone into effect, and then you send an e-mail that doesn't reference the contract, that doesn't reference the two triggers that very broadly says, at this time we are not calling for an evacuation of the marina. So I'm struggling with how is that not waiver or estoppel. The only call for that it could have been referring to is the Part A of the two-prong test. I would agree with you had the 100-mile trigger not occurred, but now we have the boaters, because the trigger has occurred, they have to start evacuating, and you send an e-mail that says, we're not asking you to evacuate. How is that not telling the boaters, oh, and they're saying they're waiving the contractual provision that requires it. We could have. Let's say that on September 12th, we could have said we're activating our mandatory evacuation. Absolutely. And that way they would both be in effect, but the mandatory evacuation has stricter deadlines than the United States Weather Service activated. So you have not activated this, but their contractual trigger, the 100-mile trigger has been activated, and then you send an e-mail that says, we're not calling for the evacuation. Why would any boater do anything other than they have waived? Well, certainly many boaters did, and many boaters did vacate. Because boaters are always free to evacuate. Do we have any indication that we have boat, you just said some boaters didn't think this was waivered because they left. Is that a fair assumption? Do we have declarations that they said, oh, we knew that we still had to evacuate. We knew that the marina was not waiving the 100-mile trigger. I don't think so. To add to that, I mean, it could have just been that they didn't evacuate because they were concerned about possible damages to their own boats, independent of any kind of contractual obligation to your client. For example, you know, if I think that a hurricane's coming, I might put up the screens when it's, you know, a week before it looks like it's going to hit, because I don't want to have to do it when it's raining and there's a million other things going on just to be on the safe side. Why isn't, you know, why isn't that at least equally a possibility here if there's no evidence in the record as to why it was that the others evacuated? Well, the boat owners agreed that leaving their boats in the marina would not only damage the docks but would damage their boats, and that's exactly what happened. Well, but we also had a weird situation with Sally where, as all the parties agree, and it's in the record, this was not tracking to the marina and made a weird turn and hit the marina. So the 100-mile trigger has occurred, and then after that, the marina sends out an email that says we're not calling for the evacuation. I'm still struggling with why it is that the boater wouldn't think, oh, they've just waived our contractual obligation to evacuate because of the 100-mile trigger. Well, the law requires that to be a clear relinquishment of a right. I'm trying to figure out why it's not. The only provision that had been invoked at this moment is the 100-mile trigger, and you guys send out an email that says don't. It doesn't mention anything about the boat owner's duty to pay for any damages their boats cause to the marina. I don't know why. If they're sitting there thinking, the boaters are thinking, we have to evacuate, and you send out an email that says you don't have to evacuate, why do they not think that you do? Well, we waived the MMC-mandated evacuation things by not giving a notice to evacuate, with or without these emails. I mean, take these emails away. Did MMC waive the MMC-mandated duty to vacate? Yes. Had the 100-mile trigger not occurred, that we're just sitting in this storm zone and there's no contractual trigger, and you guys send out an email saying we're not calling for the evacuation, I think the boaters think, oh, they're not invoking theirs. The problem for me is that the boaters' obligation had already been triggered, and then you guys sent out an email saying don't have to evacuate. Well, the boaters had not only the duty to vacate. Let's take those away. Let's say that there was neither an either-or duty to vacate your boat. All right? And let's assume that what we're left with is the boat owner saying, we know that leaving boats in the marina can cause damage to the marina and to our boat. And then we look at paragraph 26 that says, notwithstanding any other remedies, rights in this contract, discussed before or discussed after, you, the boat owner, agree to pay for any and all damages your boat causes to our docks. Now, where was there an absolute, clear, unambiguous waiver of that duty? And we're talking about the difference between rights and duties here. MMC had the right to speed up the deadlines for vacature through giving an MMC notice, speed them up beyond what the first weather bureau mandated or triggered for evacuation does. Take those out all together. Say there was no mention of vacating the marina whatsoever. Are they still responsible for the damages that their boat caused? I think the answer to that is clearly yes. That's what Judge Wetherall found. In fact, Judge Wetherall really eloquently says that. I mean, he narrows down the only real relevant email as being the 9-12 email. And he says . . . It's a pretty relevant one, though. Yeah. I mean, that's the one where you guys say, at this time, we are not calling for evacuation of the marina. And as Judge Branch has noted, it was after the 100-mile trigger. And that, of course, that email is the only email that says that. And that email, what does it not say? It does not say you have no responsibility. Go ahead and leave your boat here, and you're not responsible. There's nothing . . . There's also nothing after it or at any point that says, reminder of your obligations under the contract. And so, you leave the owners with the impression, at least arguably, that you are relieving them of their obligations under the contract. Your Honor, I'm not aware of any provision within contract that says you have to remind the party of their duties and obligations. I don't think you do if you don't affirmatively suggest to them that they are relieved of their obligations. Well, and Your Honor, I would say, I think Judge Wetherall had that September 12th email correctly. He says, and the facts in that email are undisputed. It says what it says. And there's absolutely nothing in that email that says, even if you construe that email to say, it's okay for you to leave your boat in there. There's nothing in that email that says, and if you do, we're not going to hold you responsible for damage. And I think that . . . I have a question about damage. So, you've been talking joint and several, and 26A9 says, the tenant shall be liable for any and all damages to the landlord's property, which is caused by the tenant's boat. How do you square joint and several liability with that provision? Your Honor, the joint and several is typically used in the tort context, not here. I know, we have a contract. I think what the Corbin test has adopted by three separate, four to DCA says, is that if your cause was a substantial factor in the damages, you're responsible for the damages. You're saying that this contract does not override any general test, that the parties who had a meeting of the minds and entered into this mortgage agreement and said the tenant is only responsible for what damage the boat caused. You're saying that that has no application? Your Honor, I'm saying that causation is a legal issue, and that causation, as adopted by three separate DCAs in the state of Florida, says that causation in this, under these facts, is if you were a substantial factor. The court found that on the substantial factor test, the court found that here, the boat owners agreed in their dockage agreement that a boat left in the marina during a hurricane will cause serious and substantial damage to the marina property. Those admissions, coupled with the uncontroverted testimony of MMC's experts that all boats left in the marina during the hurricane contributed in a substantial way to the destruction of the marina because they individually and collectively increased the amount of force on the dock to which the boat was moored during the storm, is more than sufficient to establish that each boat owner's breach of their dockage agreement was a substantial factor in the damages suffered by the marina. Indeed, there's no record evidence from which a reasonable fact finder could find otherwise. So, sort of related to this, I mean, you put in the liquidated damages provision for a reason, which was, as you know, it's very hard to figure out exactly what boat is responsible for what damage. And I'm speaking only for myself here. Sure. But I wonder whether it might be worth sending you all back to mediation to try to take one more, to try to undergo one more effort to work this out in an equitable way for both sides, especially given how much more you might wind up spending on litigation. I think both sides have serious soft points and holes in their arguments. And I guess I want to just get your reaction to that. It seems like at some point you sort of anticipated that $25,000 would be a fair settlement agreement for each boat owner. And I don't want to get into settlement discussions, but my point is simply this. Why shouldn't we consider sending you to mediation for one more attempt? Well, Your Honor, more than that has been incurred in attorneys' visas. And as you could imagine, this case has had multiple depositions and taken multiple months . . . I understand that. But there will also be a lot more incurred in the future, perhaps, or you might stand to lose the entire investment up until now, depending on how we decide this case. And that goes, at least from my personal perspective. Again, I don't know what my colleagues think. But for both sides, I think you both have substantial weaknesses in your cases that could result in a determination that one side or the other side may not like. Well, Your Honor, if you found that there was a factual dispute that prevented the court from making the rulings that it made, we go back and we have the same judge who made those rulings rule on them in a trial, because it's a judge-only trial. That's true. But then again, there will be more evidence, as we've already discussed. Well, of course, discoveries close, witnesses are disclosed, and putting people on the stand can result in things that are different than their depositions and subject to impeachment, et cetera. But one thing I want to point out, Your Honor, is that on the causation issue is that all contracts are deemed to incorporate the law. And all parties, and we recognize this is a legal fiction, not everybody knows what the law is, but we have to have legal fictions to make the law reliable. Every party is deemed to be on notice as to what the law is. And so in this particular case, the fact that if their vote was a substantial factor in the damages caused, that that vote owner was responsible for those damages is something that was known to all these vote owners. Perhaps if we don't find that there's a waiver or an estoppel problem, then we don't even get to that. That is correct, Your Honor, and that's why we're here, of course. All right. This austere court. I would point out that . . . Well, you're out of time, so I'll ask if you just would finish up, please. Certainly. I thought I had a couple more minutes, Your Honor. Actually, it's over now, so . . . Oh, is it? Okay. I'm sorry. That's all right. You gave me the 19. It's our fault. I was asking questions and speaking. I just had a feeling you might think that, so I wanted to make sure you were aware. One thing I wanted to make clear on damages is we're not asking for the vote owner who was in Dock A to be responsible for the damages that were caused to Dock D. We're doing that dock by dock, and that was the way the experts calculated the damages. So only the damages to Dock A are only for the boat owners who left the boats in Dock A, same as to Dock B, C, D, all of the docks. It is allocated to the extent it can be allocated, i.e., dock by dock, and so I wanted you to recognize that. The last thing I'd say is the parties allocate risk when they start a contract. They allocated the risk here. We took the risk to the City of Pensacola that if the docks were destroyed, we were responsible for rebuilding them. The boat owners took the risk that if the docks were destroyed, they had to pay for the docks. Those were the risky allocations. All right. Thank you. Thank you. All right. Mr. Rader, we're going to give you three extra minutes, so we're leaving out the time here. Again, don't feel obligated to use all the time. Of course, Your Honor. Thank you. Just to jump in sort of right off the bat . . .  To underscore what Judge Rosenbaum just said, we've certainly walked through the weakness on the other side. The risk to their case is the waiver-estoppel issue, but you have a looming issue too. If you do not win on waiver and estoppel, you have the potential of a joint and several damages issue. The liquidated damages provision, I understand why, but the district court did warn you that might end up coming back to be a problem for you. I understand your argument. Liquidated damages and actual damages were available, so that's why liquidated damages fell. I'm just pointing out that you have a lot to lose too, and she is talking about mediation. Just to pick up on that, it might be . . . Again, I'm speaking only for myself, and I haven't made a determination yet. Maybe we conclude that there is a factual issue remaining on the waiver and estoppel issue, in which case we send it back to Judge Weatherall, who is the same judge who already found that there was no waiver and estoppel. Then we would, of course, get to the damages issue. Keeping that in mind, what are your thoughts about trying one last time to mediate this? Your Honor, I would never say no to sitting down in any circumstance with an effort to try and . . . I mean, as an attorney representing my clients, if there's opportunity for a discussion, I would certainly encourage it. So I'll just put that out there. I mean, if you're asking, I'll say I would certainly encourage discussion. Having said that, I do want to make clear that I do feel very strongly about our legal position, and I've heard the court . . . Yes, Judge. I think your argument is that, in effect, the emails induced your clients not to move the boats, period. Correct. Just right out the storm. Exactly. That was almost like a promissory estoppel. Exactly, like an estoppel, Your Honor. That's an awful heavy thing, in my view, that a burrito would do to a flock of boats out there, is to say, don't pay any damn attention at all about the storm warnings or the 100 miles or anything else. We can't tell you to get out after . . . When the statute takes effect, we can't say a word. Right. But we're going to induce you to stay. Exactly. But that's the effect of what your argument is. It's the essence of the argument, Your Honor, and I want to highlight a few things. Number one, this is a de novo review. So I've heard counsel point it out. Judge Wetherill wrote a great order. He was lauding it. I have great respect for Judge Wetherill as well, but this is a de novo standard for this court's evaluation, and this court can look at the language that was provided, and as I make . . . Yes, Your Honor. The argument still is there's a fact issue as to whether the marina induced your people to stay and risked their boats. But, Your Honor, one thing I want to make clear from my perspective is that while the question of the forbearance or the estoppel is arguably a fact issue, I would submit is a matter of law. We understand that. Yes, Your Honor. And the reason I say that is because this is a matter of de novo review, and this court can look at the language of the emails. I do continue to say not only the email we've all talked about on September 12th after the trigger that explicitly said we're not calling for . . . Do you realize that when the marina did that, this is something to think about in this waiver business. Yes. If the marina did that, it was doing it against its own interest, for heaven's sake. But it was a choice it made. Not only the interest of the boat owners, but the emails the marina was communicating, we're willing to go down with you in the storm. Judge, you know, that's a good point because the marina owner didn't remove his boat. I understand about the marina. I understand it was someplace else. No, no, no. It was at the marina. I know. It was secured differently. But it was there. I understand that, but what you're saying is the marina is, in effect, saying there's a storm coming. We are inducing you to stay put, and we're willing to run the risk ourselves that we'll be out of business. We'll be totally destroyed. Your Honor . . . It was against their own self-interest to do that. That's your argument. Well, but . . . Well, all I'm saying is when you're thinking about a fact that you're on waiver, one of the facts is is whether or not the person would possibly intend to waive anything when it's giving away all of its rights. Understood. But waive . . . I do understand the court's point. I can't say that as a matter of law could happen. You follow me? Your Honor, I understand the point the court, Your Honor, is making. Unless they had incompetent lawyers or something like that. Well, I think, Your Honor, here's what I believe the e-mails display. What the e-mails from the marina display is that they intentionally, consciously, and with a specific intent to send the message to the boaters, said we are not calling for an evacuation and, in fact, told them to come to . . . Not right now. But that right now was after the trigger, Your Honor. Well, I understand that, but it was before the statute set in. But the trigger was triggered. I understand that. Yes, Your Honor. I understand that. And as Judge Branch, you pointed out . . . No, the implication is we will call for an evacuation before the statute bars us. That's one of the things you have to be arguing. What you're arguing is the trigger is out. We're operating under our call under the statute, which means before the Hurricane Watch. And, Your Honor . . . Before the 14th of September, right? That's right. And they never did so. In other words, they didn't do it before. They never said a word before that, so you're home free. The law supports a waiver and an estoppel. We've identified in our briefs record evidence of individuals who were, in fact, stopped in the sense that they did not leave because of the email. Judge Branch, you asked counsel, why would anyone leave in the face of that email? And I believe respectfully that anybody who sees that email that specifically says after the trigger, we are not calling for an evacuation, that tells everyone to come tie down everything as tightly as possible, again, is the antithesis of invoking some obligation that otherwise would exist under the agreement. And the email, I guess, represented for all parties, correct me if I'm wrong, a guess that Hurricane Sally was not going to do a direct hit on the marina. That was the belief. That was the belief. And I would highlight something else. You know, the fact that there was a lack of information. That lack of information affected everybody. But the marina made a choice to send out that email to make it clear that they were not invoking that rule. Not only were they not invoking it, they were explicitly nullifying it. And to the extent that there was this uncertainty, that supports two other components of why I believe we should prevail here. Number one, the fact of the uncertainty highlights the public policy reason why this contractual provision shouldn't even be allowed, but it's in our brief. And the second thing and last thing I'll say as my time comes to a conclusion is that the fact that it was uncertainty goes to the life and limb component. In other words, nobody knew that they could leave safely because of the uncertainty of the storm, and that's part of the provision that's in the agreement. I would ask this court to respectfully to reverse and remand for entry of judgment on behalf of the boat owners. But Your Honor, to your point about mediation, if the court orders it, we will certainly attend in good faith. All right. Thank you both. We will be in recess until tomorrow.